JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Radiant Images, Inc. and Gianna Wolfe

### DEFENDANTS

Fast Advance Funding, LLC; John and Jane Doe Investors

**(b)** County of Residence of First Listed Plaintiff   Los Angeles County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Shane R. Heskin and Luke E. McDaniels, White and Williams, LLP
1650 Market St., Suite 1800, Phila. PA 19103- (215) 864-6329/7037

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
        Plaintiff

☒ 3  Federal Question
        *(U.S. Government Not a Party)*

☐ 2  U.S. Government
        Defendant

☐ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                           *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☒ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | |
| | **PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. Sec. 1962

Brief description of cause:
Federal Racketeering Act, fraud, usury, and other claims stemming from an disguised usurious loan

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
in excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   C. Darnell Jones, II

DOCKET NUMBER   17-cv-4622 (CDJ)

DATE
2/21/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Radiant Images, Inc., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Fast Advance Funding, LLC, et al. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.　　　　( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health　( )
　　　 and Human Services denying plaintiff Social Security Benefits.

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d)  Asbestos – Cases involving claims for personal injury or property damage from　( )
　　　 exposure to asbestos.

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are　( )
　　　 commonly referred to as complex and that need special or intense management by
　　　 the court.  (See reverse side of this form for a detailed explanation of special
　　　 management cases.)

(f)  Standard Management -- Cases that do not fall into any one of the other tracks.　(X)

| | | |
|---|---|---|
| 2/21/2018 | Shane R. Heskin | Radiant Images, Inc. and Gianna Wolfe |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-864-6329 | 215-399-9603 | heskins@whiteandwilliams.com |
| **Telephone** | **Fax Number** | **E-mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: Radiant Images, Inc. 2702 Media Center Dr., Los Angeles, CA 90065; G. Wolfe 2211 Baxter St., Los Angeles, CA 90039

Address of Defendant: Fast Advance Funding, LLC 141 N. 2dn Street, Philadelphia, PA 19106

Place of Accident, Incident or Transaction: Philadelphia, PA and Los Angeles, CA
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐   No☒

Does this case involve multidistrict litigation possibilities?    Yes☐   No☒
*RELATED CASE, IF ANY:*
Case Number: 17-cv-4622 (CDJ)    Judge  C. Darnell Jones, II    Date Terminated:    N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☒   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
(Please specify)  Federal Racketeering Act

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify)

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*
I, Shane R. Heskin, Esq. , counsel of record do hereby certify:
☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: 2/21/18    Attorney-at-Law    201925   Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 2/21/18    Attorney-at-Law    201925   Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RADIANT IMAGES, INC, and GIANNA WOLFE <br><br> Plaintiffs, <br><br> v. <br><br> FAST ADVANCE FUNDING, LLC; JOHN AND JANE DOE INVESTORS, <br><br> Defendants. | Civil Action No. <br><br><br> JURY TRIAL DEMANDED <br><br> **COMPLAINT** |

Plaintiffs Radiant Images and Gianna Wolfe (collectively "Plaintiffs") bring this Complaint and Demand for Jury Trial against Defendants Complete Business Solutions Group ("CBSG"); Fast Advance Funding, LLC ("Fast Advance"); and the John and Jane Doe Investors (the "Investor Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      This is a RICO action seeking, among other things, a temporary restraining order to protect the health and safety of the individual owners, employees and families of Plaintiffs from physical attack and violence from Defendants.

2.      The facts of this case are heinous and have been reported to the proper legal authorities. *See* Ex. A.

3.      On February 15, 2018, Defendants sent an "associate" to Plaintiffs place of business and threatened the lives of Plaintiffs' owners, wives and children if they did not immediately pay Defendants.

4.      The "associate" sent is named Gino Gioe ("Gino").   He entered the premises under the false name Gino Gioelli.  The encounter was recorded by surveillance cameras, which has also been turned over to enforcement authorities:



5.      Gino is a former felon, who did more than ten years in jail for tax evasion, stock fraud, and operating a stolen car ring.  He is physically imposing:

# Ex-con's prison fitness regime is no hard cell



20461027v.1

6.      Upon entry of the premises under a false name, Gino demanded to see Plaintiffs about an alleged business debt that was personally guaranteed by the owners of Radiant Images.

7.      Earlier that day, Defendants CBSG and Fast Advance had learned that Plaintiffs had placed a stop payment on the daily and weekly ACH withdrawals being electronically debited in excess of $60,000 per week.

8.      Gino informed Plaintiffs that placing a stop payment on these federal wire transfers was an "aggressive move," which was the type of moves that place wives and children at risk.  He then told Plaintiffs of a story where he visited a man by the name of "Danny" in Idaho who similarly borrowed a lot of money from Defendants and would not respond to them. He said he went to Idaho, noting that Idaho was the flattest place on earth, the middle of nowhere and as he was proceeding on the highway, he came up to a huge car accident.  He then informed Plaintiffs that when he looked inside the care, it was "Danny."  He then informed Plaintiffs that "these are the kid of things which strongly effect wives and children."

9.      Gino then asked one of Plaintiffs' employees about his office hours and how late he works.

10.      Gino then informed Plaintiffs that it was very important to take care of this immediately and asked how much Plaintiffs could pay.  He then said he would call the next day, February 16th, at 9 am.

11.      After Plaintiffs informed Gino that they needed more time, Gino called Joe Mackie and placed him on speakerphone.  His real name is Joseph McElhone ("Mr. McElhone") and is reputed to have Mafia connections.

12.      Joe Mackie answered the call and immediately asked: "Where is my money?"  He admitted that Plaintiffs had previously informed Defendants of their cash flow problems but that

he did not want to hear any excuses, he wanted his money.  He reiterated that "it is a lot of money and he would crush" Plaintiffs.

13.     After a lot of screaming and yelling, Gino left the premises upon request, promising that he "calls all the shots" and nothing would happen until Plaintiffs spoke on Friday, February 16th, 2018.

14.     On the phone call, "Joe Macke" got into a screaming match with one of Plaintiffs employees, ultimately informing the employee that he did not want to deal with this clown anymore, and instructed Gino that he knew what he had to do, and to "take care of him. It's all in your hands now."

15.     After this phone call, this employee purchased a bulletproof jacket and a gun because he is in fear for his life and physical safety.

16.     The other employee who witnessed these events informed Plaintiffs that he liked working for the company but did not want to die.

17.     On February 18th, Plaintiffs reported this incident to the Los Angeles Police Department.

## THE PARTIES

18.     Plaintiff Gianna Wolfe is the co-Founder of Radian Images, Inc., and an adult resident and citizen of Los Angeles, California.

19.     Plaintiff Radiant Images Inc, is a corporation organized and existing under the laws of California, with a principal place of business located at 2702 Media Center Drive, Los Angeles, CA 91016.

20.     Defendant Fast Advance is a limited liability company organized and existing under the laws of Pennsylvania with a principal place of business located 141 N. 2nd Street,

-4-

Philadelphia, Pennsylvania, 19106.   Upon information and belief, each of Fast Advance's members are Pennsylvania citizens.

21.     On information and belief, each of the John and Jane Doe Defendants are investors in Fast Advance and each are citizens of New York, New Jersey or Pennsylvania.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Radiant Images' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961–68.   The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

23.     Additionally, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

24.     The Court further has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and Plaintiffs are citizens of a State different defendants and none of the exceptions to that section apply.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

26.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

**A.      The MCA Industry.**

27.      The Defendants are part of the Merchant Cash Advance Industry (MCA"), which preys upon small, financially distressed businesses throughout the United States and fraudulently induce them into advances pursuant to so-called future account receivable purchase agreements or merchant case advance agreements.

28.      The terms and conditions of these agreements are wholly inaccurate, and knowingly designed and/or used by the Defendants to deceive the small businesses and others into believing the agreements do not contemplate a loan transaction so that they do not trigger the criminal usury laws of various states.

29.      When Plaintiffs and other small businesses cannot meet their obligations under these agreements, Defendants offer new advances under even more unconscionable terms.

30.      Eventually, the terms become too oppressive, the small businesses default, and the Defendants aggressively pursue the small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening, deceptive and illegal collection tactics.

31.      In the end, Plaintiffs and other the small businesses face certain financial ruin while the Defendants recover not only the principal advanced, but also interest at rates that often criminal usury thresholds.

**B.      Radiant Images, Inc. and Wolfe.**

32.      Radiant Images is an award winning service provider to the motion picture industry located in Los Angeles, California.

20461027v.1

33.     For more than 10 years, it has provided motion picture companies with 2D, 3D, VR, and augmented reality solutions and access to various specialized equipment through its rental services.

34.     In as early as 2015, Radiant was suffering financial difficulties and it needed to quickly obtain additional financing in order to meet its daily operating needs and expand its business.

35.     In or around this time, CBSG contacted Radiant to determine if Radiant was in need of cash for its business.

36.     Once apprised of Radiant's need, CBSG brokered a series of loans (collectively, the "Transactions") between Broadway Advance Funding ("Broadway"), Fast Advance, and Plaintiffs (collectively, the "Agreements") from 2015 until January 2018. Plaintiffs' Agreement with Fast Advanced is attached hereto as Exhibit B.

37.     Upon information and belief, CBSG has directed the acts of Broadway and Fast Advance for at least four years. Together, along with the John and Jane Doe investors of Broadway and Fast Advance, these companies form the Lending Enterprise.

38.     Pursuant to the Agreements, Fast Advance advanced $500,000 (the "Purchase Price") to Radiant in exchange for the purported purchase of *all* of its future accounts receivables and the proceeds thereof (the "Receipts") until $915,947.63 (the "Purchased Amount") was remitted to CBSG or Broadway via daily ACH withdrawals of specified amounts (defined as the "Weekly Specific Amount" or "Monthly Specific Amount") from Radiant's bank account (the "Bank Account"). The average payment made by Plaintiffs was $11,742.92 weekly.

20461027v.1

39.     Thus, at the inception of each Agreement, Fast Advance anticipated repayment of the Purchased Amount within a specified term determined by the number of daily or weekly payments required for full repayment thereof – just like a loan.

40.     To secure performance of the daily or weekly withdrawals, Radiant granted Fast Advance a security interest in certain of its assets and Wolfe was required to personally guarantee Radiant's performance of the representations, warranties and covenants under the Agreements.

41.     When Plaintiffs could not make the daily or weekly payments required by the Agreements, CBSG, Broadway, or Fast Advance would offer the Plaintiffs new advances under similarly onerous terms and use the proceeds to pay off the old advances, leaving the Plaintiffs with little "new cash" under the new Agreement and launching the Plaintiffs into a never ending spiral of debt from which they knew the Plaintiffs could never come out of.

42.     In reality, the unconscionable Transactions are an unscrupulous pyramid scheme, whereby the Plaintiffs were pushed toward an unsustainable level of indebtedness in a relatively short period of time, creating circumstances under which the Defendants could then go after not only the assets of Radiant, but also the personal assets of Wolfe.

**C.     The Agreements are disguised loans.**

43.     Although documented as the purported purchase of receivables, the Transactions were in form, substance and every conceivable way, loans.

44.     When viewed as what it truly was, a loan, the Agreement charges usurious amounts of interest, exceeding California's usury limit and New York's criminal usury threshold. *See* Exhibit C, attaching the interest calculation for the September 20, 2017 loan.

-8-

### a. The "Specific Weekly and Monthly Amount" is a disguised, fixed, loan payment

45.     The Agreement required Plaintiffs to make weekly or monthly payments to Fast Advance, purportedly based on a specified percentage of Plaintiffs' daily receivables.

46.     This "Specific Weekly and Monthly Amount" is allegedly based on a good-faith estimate of Plaintiffs' daily future receivables, but, in reality, it is a knowingly false term unilaterally dictated by Fast Advance in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Plaintiffs' daily receivables.

47.     Plaintiffs were required to pay the "Specific Weekly and Monthly Amount" until Fast Advance received the "Purchased Amount" in full.

### b. The "Purchased Amount" is the disguised repayment of principal and interest

48.     The purported "Purchase Amount" of the receivables is also complete fiction. In the Agreement, Fast Advance represents that the "Purchased Amount" is tied to the value of the purchased receivables. In reality, however, the alleged fair market value was unilaterally dictated by Fast Advance based on the creditworthiness of the merchant.   In contrast, true factoring agreements determine the fair market value of the receivable based on the credit worthiness of the customer expected to pay the receivable.

49.     Furthermore, the Agreement is not tied to specific and existing contracts for goods already delivered by the merchant to a customer.  In other words, the right to repayment is not tied to the value or money owed to Plaintiffs based on goods or services already provided to a customer who has not yet paid, but instead is based on any and all future receivables based on the sale of goods or services by Plaintiffs until the "factoring agreement" was paid in full. By definition, these terms do not constitute a factoring agreement, but rather a loan, and a usurious one at that.

20461027v.1

### *c.   The Agreement provided for full recourse in the event of a default or bankruptcy.*

50.    Unlike a true factoring agreement, the terms of the Agreement provided for absolute payment from the Plaintiffs.

51.    If the Plaintiffs were ever to miss a payment, they would be in default and Fast Advance would be entitled to confess judgment against the Plaintiffs.

52.    The Agreement allowed for up to four nonsufficient fund fees of $75 before default would occur.

53.    In order to obtain the loan, Radiant was required to grant to Fast Advance "a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory … now or hereafter owned or acquired by SELLER/MERCHANT and (b) all proceeds, as that term is defined in Article 9 of the UCC . . . "

54.    The security agreement further provided that, upon default, Fast Advance "may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration of otherwise."

55.    Wolfe was also required to personally guarantee performance of the representations, warranties and covenants under the Agreements.

56.    Further, should Plaintiffs ever enter bankruptcy, the Agreements provided "Protections 2 [confession of judgment] and 3[enforcement of security interest in collateral] are immediately invoked."

### D.    Collection of the Agreements

57.    In or around January 2018, Plaintiffs came to the realization that they would soon have trouble making payments to Fast Advance.

58.     To prevent this from occurring, Radiant reached out to Fast Advance's representative, Mr. McElhone of Complete Business Solutions Group, Inc., dba Par Funding, numerous times to request that the required daily payment be lowered.

59.     In fact, Plaintiffs specifically provided Mr. McElhone with a copy of Radiant's business accounts to show that they did not have sufficient cash flow to make their weekly and monthly payments.

60.     In response to each of Radiant's requests, Mr. McElhone essentially brushed off the request, suggesting that the parties "talk next week."

61.     Ultimately, Radiant became unable to make payments on the Agreements on or around February 15, 2018.

62.     In response, the Lending Enterprise began a vicious campaign where they proceeded to threaten the lives of Radiant's founders and the reputation of the business.

63.     First, the Lending Enterprise sent a physically imposing, former federal-prison inmate with reputed Mafia ties to Radiant's offices.

64.     The enforcer, knowing the illegal nature of his impending actions, signed into Radiant's building using a false name.

65.     The enforcer then spoke co-founder of Radiant, Michael Mansouri ("Mansouri"), and Kurk Stevens, a Radiant employee, and made veiled threats against Mansouri and Wolfe's lives.

66.     The enforcer told Mansouri that in deciding to cease payments to the Lending Enterprise, Wolfe and Mansouri made a decision that "affects wives and children."

67.   The enforcer then proceeded to tell Wolfe and Mansouri the story of another business owner who was unable to make payments. The enforcer stated that he was driving to the debtor's business and came across an accident that just so happened to have involved the debtor.

68.   From this conversation, Wolfe and Mansouri inferred that the debtor's accident was related to the debtor's missed payments to the Lending Enterprise.

69.   Most shockingly, on February 16, 2018, Mr. McElhone allegedly told the enforcer that he was done with this clown and to "take care of him."

70.   As a result of these threats against their lives, Wolfe and Mansouri immediately filed a report with the Los Angeles Police Department, informing the police that they were scared for their lives.

71.   These threats have also affected Radiant's employees; they have stated that while they love working for Radiant, they do not love it enough to be killed for it.

72.   In addition to the threats made to Wolfe's and Mansouri's well-being, harassed Radiant's customers and business associates.

73.   When no additional payments were received, CBSG, on behalf of the Lending Enterprise, notified Radiant's customers and non-customers of the debt.

74.   On February 16, 2018, CBSG sent Radiant's customers an email that stated:

> We have purchased the future receivables for Radiant Images Inc.
> DBA HD Camera Rentals. Please see the attached correspondence
> which details said transaction. Despite our contractual agreement,
> Radiant Images Inc. DBA HD Camera Rentals has since defaulted
> on their payment. Accordingly, per UCC 9-406, please allow this
> correspondence to serve as a request that you hold all funds
> payable to Radiant Images Inc. DBA HD Camera Rentals in
> reserve until $2,651,880.22 is accrued.

*See, e.g.*, Exhibit D, attaching CBSG's email.

-12-

75.     The email also contained a notice, purportedly prepared by CBSG's attorney, that indicated that all payments should be forwarded to CBSG. *See, e.g.*, Exhibit E, attaching CBSG's notice.

76.     Further, CBSG informed at least 19 other members of the American Society of Cinematographers, an invitation only organization where only directors of photography and special effects experts with distinguished credits were asked to join, of Radiant's debt.

77.     The American Society of Cinematographers, however, is not one of Radiant's account debtors. Upon information and belief, this communication was sent either (1) without conducting any due diligence in determining if the organization was an account debtor, or (2) solely to embarrass Radiant and force them to make additional payments on the agreements.

78.     As a result of these notices and emails, has lost profits and clients and has had its reputation within the industry significantly harmed.

## DAMAGES

79.     As a direct and proximate result of the financial strain resulting from the usurious loan made by Fast Advance, Plaintiffs were forced to enter into additional usurious loans, brokered by CBSG, with Broadway to stay afloat.

80.     As a direct and proximate result of each of these loans, Plaintiffs paid interest in excess of that allowed by California law (10% or 5% plus the applicable Federal Reserve Rate).

81.     As a direct and proximate result of each of these loans and the Lending Enterprise's subsequent collection tactics, Plaintiffs suffered indivisible injury through lost profits.

## FIRST CAUSE OF ACTION
### Usury

82.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

-13-

20461027v.1

83.     Defendants have violated New York's usury laws.

84.     As noted by a New York appellate court, the usury statutes are designed to protect victims from loansharking, "one of the most heinous, virtually bloodsucking, criminal activities of all times." *Hammelburger v. Foursome Inn*, 76 A.D.2d 646, 649-650 (2d Dep't 1980).

85.     Defendants knowingly and intentionally violated N.Y. Penal Law § 190.40 by charging an outrageous interest rate more than twice the 25% maximum interest rate permitted under the criminal laws of this State.

86.     The Agreement set forth a collateralized loan transaction.

87.     Because the Loan Agreement is a criminally usurious loan in violation of N.Y. Penal Law § 190.40, the transaction, including all related instruments, is therefore unenforceable as a matter of law.

88.     Defendants have also violated California's usury laws.

89.     Fast Advance and the other Lending Enterprise members have devised and engaged in a scheme to fund, issue, and collect usurious loans, masked as "merchant agreements" or "factoring agreements," to cash-strapped business.

90.     Radiant has taken a usurious loan from Fast Advance, under the direction of CBSG, and Wolfe has personally guaranteed this debt.

91.     Fast Advance is not exempt from the prohibitions of California's usury laws, nor are the transactions that are the subject of this action exempt from California's usury laws.

92.     The interest charged by Defendants in connection with these transactions is in excess of the maximum interest rates permitted by California's criminal threshold for usury under Stats. 1919, p. lxxxiii, § 2; and Stats. 1919, p. lxxxiii, § 3 and Article XV, § 1 of the

-14-

California Constitution, (the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank).

93.     The terms of the Agreement (including, but not limited to, the "Specific Weekly and Monthly Amount" and Wolfe's personal guarantee) indicate that Radiant's obligation to pay the interest was absolute.

94.     As set forth above, Defendants willfully intended to enter into the usurious transactions.

95.     As a direct and proximate result of Defendants' disguised loans, Plaintiffs have incurred substantial injury to their business as they have been forced to pay a usurious amount of interest.

## SECOND CAUSE OF ACTION
### Fraud

96.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

97.     Fast Advance and CBSG intentionally misrepresented the true nature of the transactions in order to avoid application of New York's and California's criminal laws.

98.     Fast Advance and CBSG knowingly misrepresented that the disguised loan was enforceable when it was illegal under law by, *inter alia*, emailing Plaintiffs copies of the Agreement, requesting that Plaintiffs execute the Agreement and requesting that Plaintiffs authorize Fast Advance to make withdrawals of the Specific Amount from Fast Advance's bank account, all of which created the false impression that the Agreement was legally enforceable and that Plaintiffs are obligated to repay when they were not.

99.     Fast Advance and CBSG obtained Plaintiffs written authorization to collect on the Agreement via ACH withdrawals from Plaintiff's bank account and Fast Advance collected upon

this illegal contract via ACH withdrawals from Plaintiff's bank account, which created the false impression that the Agreement was legally enforceable and that Plaintiffs are obligated to repay when they were not.

100.    These false impressions were material, and Plaintiffs did not reasonably know that the contracts were illegal.

101.    In addition, Fast Advance falsely represented the market value of the future receivables that Broadway purported to purchase in each of the Agreements. This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Fast Advance in order to disguise the true nature of the Transactions.

102.    Fast Advance and CBSG's misrepresentations were intended to induce reliance because if Plaintiffs were aware that (1) the Agreement was illegal and (2) the market value of the receipts were incorrect, Plaintiffs would not have executed the documents and entered into the Transaction.

103.    Fast Advance and CBSG knew that the representations were false at the time they were made.

104.    Fast Advance and CBSG made these representations with the intent to deceive Plaintiffs and with the intent to avoid the criminal usury laws.

105.    Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as it executed the Agreement and was forced to pay interest in excess of New York's and California's criminal usury threshold.

106.   Plaintiffs were directly and proximately damaged Fast Advance and CBSG's knowingly false representations by paying interest and principal on criminally usurious loans for which they had no legal obligation to repay.

107.   The conduct of CBSG and Broadway was intentional, outrageous and in reckless disregard of the Plaintiffs' rights.

### THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)

108.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

**A.     Culpable Persons**

109.   Fast Advance is a limited liability company capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

**B.     The Association-in-Fact Enterprise**

110.   The Investor Defendants, Fast Advance, CBSG, and Broadway are separate individuals or entities associated with each other by shared personal and/or one or more contracts or agreements for the purpose of originating, underwriting, servicing and collecting usurious loans to the Plaintiffs and countless other small businesses throughout the United States.

111.   This association of the Investor Defendants, Fast Advance, CBSG, and Broadway constitutes a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. 1962(c), as the term is defined in 18 U.S.C. 1961(4).

112.   Upon information and belief, the members of the Lending Enterprise have functioned as a continuing unit for at least the past four years.

113.    The Lending Enterprise has an existence separate and apart from the illegal activity in which it engages by entering into legal financing agreements and attempting to collect lawful debts using legal collection practices.

**C.      The Defendants' distinct roles in the Enterprise.**

114.    Each of the members has a distinct role in the Lending Enterprise.

115.    The John and Jane Doe Investors provide capital for investment by the Lending Enterprise in lawful and unlawful loans, including the Agreements.

116.    CBSG acted as a broker for the Lending Enterprise, soliciting borrowers, including the Plaintiffs, obtaining necessary underwriting information for use by Broadway and CBSG in underwriting the lawful and unlawful loans and assisting the collection of the lawful and unlawful loans by obtaining the borrowers authorization to effect daily ACH withdrawals from specified bank accounts, and directed the affairs of the Lending Enterprise.

117.    Fast Advance underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements.

118.    Broadway underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements.

**D.      Engagement in Interstate Commerce**

119.    The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

120.    Specifically, the members of the Lending Enterprise maintain offices in New York and Pennsylvania and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Lending Enterprise to borrowers- in California and throughout

-18-

the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically through an automated clearing house.

121.    In the present case, all communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Specific Amount via electronic interstate withdrawals processed through an automated clearing house.   Additionally, the Lending Enterprise used interstate email communications to attempt to collect when the Plaintiffs were unable to make the daily payments under the Agreements.

**E.      Conducting Affairs through a Pattern of Racketeering.**

122.    CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud) in violation of 18 U.S.C. 1962(c).

123.    Beginning no later than in or around September, 2014 and continuing today, CBSG devised and carried out a scheme to conduct the affairs of the Lending Enterprise to intentionally defraud borrowers in California and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay and to intentionally defraud others into satisfying such loan obligations when a borrower defaulted.

124.    Since Fast Advance, CBSG and Broadway are each web-based companies that conduct virtually all of their business through the internet, email communications, telephone calls, and wire transfers, it was reasonably foreseeable that interstate emails, telephone calls, and

wire transfers would be used in furtherance of the scheme, and, in fact, intestate emails, telephone calls and wire transfers are used in furtherance of the scheme.

125.   Specifically, CBSG directed, approved or ratified, Fast Advance's and Broadway's use of the internet, interstate email, telephone calls, and other communications to intentionally defraud borrowers in California and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay.

126.   As part of this scheme, by the use of interstate emails and telephone calls, BCSG targets and solicits cash-strapped businesses upon which to pawn of usurious loans funded by Fast Advance or Broadway.  These interstate emails and telephone calls intentionally create the false impression that the usurious loans are legally enforceable by:

> (i) misrepresenting the true nature of the loan transactions as receivable sales in order to avoid applicable criminal usury laws;
>
> (ii) falsely representing that disguised loan contracts are enforceable when they are illegal under New York and California or other applicable law;
>
> (iii) advising the illegal loans would be funded through interstate wire transfers; and
>
> (iv) directing all loan repayments to be made by electronic interstate bank withdrawals via an automated clearing house.

127.   Once the loans are approved by Fast Advance or Broadway, Fast Advance, or Broadway further the scheme by using interstate wires to fund the unlawful loans and electronic interstate bank withdrawals to repay the amounts advanced under the disguised loans, all of which further create the impression that the usurious loans are legally enforceable contracts which CBSG, Fast Advance, and Broadway know to be false.

128.    If a borrower defaults, CBSG, Fast Advance, and Broadway use interstate emails and telephone calls to once again fraudulently induce the borrowers to obtain new advances under loans funded by Fast Advance and Broadway that CBSG, Fast Advance, and Broadway know misrepresent the true nature of the transaction in an effort to evade applicable usury laws and create the false impression that the contracts are legally enforceable when they are not thereby inducing the borrowers to enter into and make payments on new usurious agreements to pay off the obligations under the old ones.

129.    Upon information and belief, borrowers in California and throughout the United States, like the Plaintiffs, reasonably rely upon these knowingly false representations in order to enter into and make payments on criminally usurious loans.

130.    In the present case, through a series of interstate emails  beginning in September 2015, CBSG solicited Plaintiffs, and, upon approval by Broadway and Fast Advance, provided Plaintiffs with a copy of the several Agreements which CBSG asked that Plaintiffs execute, together with a form authorizing CBSG to electronically withdrawal the daily payments from Radiant's bank account.  CBSG's actions were intentionally designed to and, in fact did, create the impression that the Agreements were legally enforceable contracts which Broadway, Fast Advance, and CBSG knew to be false.

131.    Fast Advance and Broadway furthered the scheme by funding the Agreements through an interstate wire transfer and thereafter withdrawing the Specific Amount due under the Agreements by electronic interstate withdrawals processed through an automated clearing house, all of which was intentionally designed by CBSG, Fast Advance, and Broadway to and, in fact did, create the impression that Agreements were legally enforceable contract which they knew to be false.

-21-

132.   Whenever the Plaintiffs could no longer make the daily payments under an Agreement, CBSG, Fast Advance or Broadway, used similar emails and wire communications to intentionally create the false impression that each successive disguised loan was a legally enforceable contract in order to induce the Plaintiffs to enter into and make payments on the criminally usurious loans.

133.   Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as they executed each of the Agreements and were forced to pay interest in excess of California's criminal usury threshold.

134.   When the payments ultimately became too much and the Plaintiffs could no longer make any payments under the Agreements, CBSG used interstate emails and telephone phone calls on or about February 15-16, 2018 to give Plaintiffs customers the impression that the Lending Enterprise had an enforceable debt, and that payments due to Plaintiff should be forwarded to CBSG.

135.   Fast Advance's, Broadway's, and CBSG's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343 which is "racketeering activity" as defined by 18 U.S.C. 1961(1).   Its repeated and continuous use of such conduct to participate in the affairs of the Lending Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**F.      Conducting Affairs Through the Collection of Unlawful Debt**

136.   The Agreements between Plaintiffs and Fast Advance, CBSG, and Broadway constitute unlawful debt within the meaning of 18 U.S.C. 1962(c) because (1) they violate applicable criminal usury statutes, and (2) the rates are more than twice the legal rate.

137.   Upon information and belief, the rates charged by these Agreements were more than twice  New York's and California's criminal usury threshold.

-22-

138.    Fast Advance, Broadway, and CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of this unlawful debt in violation of 18 U.S.C. 1962(c).

139.    Specifically, CBSG, Fast Advance, and Broadway obtained Plaintiffs' authorization to electronically withdrawal payments on an unlawful debt from Radiant's bank account.

140.    Upon receipt of such authorization, CBSG, Fast Advance, and Broadway did, in fact, make the daily withdrawals required by the Agreements.

141.    When Plaintiffs no longer could make the daily payments required under the Agreements, on February 15, 2018, CBSG, Fast Advance, and Broadway called and emailed Plaintiffs and their customers, and sent an enforce to Plaintiffs business to attempt to persuade Plaintiffs to make additional payments.

**G.    Injury**

142.    As a direct and proximate cause of Fast Advance's, Broadway's, and CBSG's violation of 18 U.S.C. § 1962(c), Plaintiffs suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs were forced to pay usurious amounts of interest and have lost, and will continue to lose, profits.

143.    Accordingly, Plaintiffs seek an Order: (i) declaring each of Plaintiffs' agreements with the Defendants to be void and unenforceable; (ii) permanently enjoining the Defendants from collecting on any further usurious loan agreements; (iii) requiring the Defendants, jointly and severally, to repay Plaintiffs all interest previously paid in excess of the applicable usury rate, including prejudgment interest; (iv) awarding punitive damages and/or treble damages as

the Court deems appropriate; and (v) requiring the Defendants, jointly and severally, to pay Plaintiffs' and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d)

144.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

145.    Each of the Defendants conspired in violation of 18 U.S.C. § 1962(d) to conduct or participate in the affairs of the Lending Enterprise through a pattern of racketeering activity and the collection of an unlawful debt.

146.    Specifically, through emails, meetings, telephone calls or other communications, each of the Defendants were in agreement that CBSG, Fast Advance, and Broadway would: (i) use wire communications to falsely represent the nature of the agreements between Fast Advance, Broadway, and their borrowers, including the Agreements; (ii) fraudulently induce borrowers, including the Plaintiffs, to enter into transactions such as the Agreements that disguised the true nature of the transactions in order to avoid application of criminal usury laws in California, New York and other states; (iii) fund usurious loan transactions between Fast Funding and Broadway and their borrowers, including the Agreements, and (iv) collect or facilitate in the collection of unlawful debt, including the loans advanced to the Plaintiffs under the Agreement.

### FIFTH CAUSE OF ACTION
### Violation of California Business & Profession Code § 17200

147.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

148.    California Business & Profession Code §§ 17200, *et seq.* ("UCL") prohibits "unfair competition" in the form of any unlawful, unfair, or fraudulent business act or practice.

149.    Since at least 2014, the Defendants have engaged in unlawful business practices as prohibited by the UCL by, and as further described in this Complaint:

-24-

a. Violating Cal. Const. Art. XV § 1 by charging interest rates in excess of 10% or 5% plus the applicable Federal Reserve rate;

b. Violating 18 U.S.C. § 1343 by furthering their scheme to defraud Radiant by (i) making and receiving wire transfers, and (ii) using wires to transmit fraudulent communications;

c. Violating 18 U.S.C. § 1692(c) by conducting the Lending Enterprise through a pattern of racketeering and the collection of an unlawful debt; and

d. Tortiously interfering with Radiant's contracts with his customers.

150.   The Defendants have engaged in these actions to further their business activities, i.e. the funding, issuing, and collection of debts.

151.   As a direct and proximate result of the Defendants' violations of the UCL, Plaintiffs have suffered, and continue to suffer, substantial injury to their business and/or property as they were forced to pay usurious amounts of interest and have lost, and will continue to lose, customers, profits, goodwill, and business value.

### SIXTH CAUSE OF ACTION
**Contract**

152.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

153.   The Agreements provide: "'[i]n the event that court determines that [Defendant] has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and [Defendant] shall promptly refund to Merchant any interest received by Funder in excess of the maximum lawful rate, it being intended that [Defendant] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

154.   The transaction set forth above is a loan transaction.

155.    Plaintiffs have paid, and Defendants have received, interest in excess of the maximum civil usury interest rate allowed by California and New York law.

### SEVENTH CAUSE OF ACTION
**Tortious Interference**

156.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

157.    Plaintiffs had an existing relationship with their clients.

158.    Fast Advance had knowledge of Plaintiffs' relationships and contracts with their customers.

159.    Fast Advance and CBSG intentionally interfered with these relationships and procured the breach of Plaintiffs' contracts by requesting that Plaintiffs customers forward all payments to CBSG.

160.    This request, however, was without justification because CBSG and Fast Funding were aware that the contract in which they purportedly purchased the receivables was unenforceable.

161.    Plaintiffs' relationships and contracts with its clients were actually interfered with as Fast Advance's and CBSG's communications caused Plaintiffs to experience a drop in clientele.

162.    As a direct and proximate result of the Defendants' tortious interference, Plaintiffs have suffered, and continue to suffer, damages as Plaintiffs have and will continue to lose customers, profits, goodwill, and business value.

163.    Accordingly, Plaintiffs seek an Order: (i) declaring the Defendants' conduct to be unlawful; (ii) permanently enjoining the Defendants from engaging in the unfair, unlawful, and deceptive conduct described above; (iii) requiring the Defendants, jointly and severally, to pay compensatory damages in an amount to be determined at trial; (iv) awarding punitive damages

and/or treble damages as the Court deems appropriate; and (v) requiring the Defendants, jointly and severally, to pay Plaintiffs' attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Radiant Images, Inc., and Gianna Wolfe, respectfully request that this Court enter an order:

A.      Declaring that Defendants' actions, as set out above, constitute violations of California Stats. 1919, p. lxxxiii, § 2; and Stats. 1919, p. lxxxiii, § 3 and Article XV, § 1 of the California Constitution, N.Y. Penal Law § 190.40, the Racketeer Influenced and Corrupt Organizations Act (as against the Defendants only), and California's Unfair Competition Law, as well as breach of contract, and tortious interference with contract;

B.      Awarding injunctive and other relief as is necessary to Plaintiffs;

C.      Awarding actual and compensatory damages to Plaintiffs, in an amount to be determined at trial;

D.      Awarding Plaintiffs pre-judgment interest;

E.      Awarding Plaintiffs treble and/or punitive damages;

F.      Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees and costs;

G.      Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims that may be so tried.

Dated: February 21, 2018                                **WHITE AND WILLIAMS LLP**

                                                        BY: _____
                                                        Shane R. Heskin
                                                        Luke E. McDaniels

-27-

1650 Market Street, Suite 1800
Philadelphia, PA 19103
(215) 864-6329/ 7037
heskins@whiteandwilliams.com
mcdanielsl@whiteandwilliams.com

20461027v.1

# EXHIBIT A

**Los Angeles Police Department**
**INVESTIGATIVE REPORT**

UCR CODE ☐ COMBINED EVID. REPORT
CC: ☐ MULTIPLE DRS ON THIS REPORT

Page ___ of ___    03.01.00 (08/15)

REPORT OF: CRIMINAL THREATS

INVEST DIV. NO E    INC # 180318005591    DR #

| CASE SCREENING FACTOR(S) | |
|---|---|
| ☐ SUSPECT-VEHICLE NOT SEEN | |
| ☒ PRINTS OR OTHER EVIDENCE NOT PRESENT | |
| ☒ MO NOT DISTINCT | |
| ☒ PROPERTY LOSS LESS THAN $5,000 | |
| ☒ NO SERIOUS INJURY TO VICTIM | |
| ☒ ONLY ONE VICTIM INVOLVED | |

VICTIM

LAST NAME, FIRST, MIDDLE (OR NAME OF BUSINESS): Mengistu@Rafi@Michael M    SEX  DESC  HT  WT  AGE  DR #

ADDRESS: R- 2525 Virginia Dr Apt #400390    ZIP 90065    PHONE 310 660 8948  X
B- 2702 Media Center Dr    90065    (323) 157-1314

E-MAIL ADDRESS: Michael@OpusNot.Angel.com    CELL PHONE

DR. LIC. NO. (IF NONE, OTHER ID & NO.)    FOREIGN LANGUAGE SPOKEN    OCCUPATION: Owner/CEO

PREMISES (SPECIFIC TYPE): OFFICE    ☐ ATM

ENTRY 459-BFV POINT OF ENTRY    POINT OF EXIT
☐ FRONT
☐ REAR
☐ SIDE
☐ ROOF
☐ FLOOR
☐ OTHER

LOCATION OF OCCURRENCE    SAME AS V'S  ☐ RES. ☒ BUS.    R.D. 1134    PRINTS BY PREL. INV. ATTEMPT ☐Y ☐N  OBTAINED ☐Y ☐N

METHOD

INSTRUMENT-TOOL USED

DATE & TIME OF OCCURRENCE: 2-18-18, 1629 HRS    DATE & TIME REPORTED TO PD: 2-18-18, 2145

VICT'S VEH. (IF INVOLVED) YEAR, MAKE, TYPE, COLOR, LIC. NO.    NOTIFICATION(S) (PERSON & DIVISION)    CONNECTED REPORT(S) (TYPE & DR #)

TYPE PROPERTY STOLEN/LOST/DAMAGED  03.04.00 GIVEN    STOLEN/LOST $    RECOVERED $    EST. DAMAGED ARSON / VAND. $

MO IF LONG FORM, LIST UNIQUE ACTIONS. IF SHORT FORM, DESCRIBE SUSPECT'S ACTIONS IN BRIEF PHRASES, INCLUDING WEAPON USED. DO NOT REPEAT ABOVE INFO BUT CLARIFY REPORT AS NECESSARY. IF ANY OF THE MISSING ITEMS ARE POTENTIALLY IDENTIFIABLE, ITEMIZE AND DESCRIBE ALL ITEMS MISSING IN THIS INCIDENT IN THE NARRATIVE.

Vict and Susp involved in a verbal dispute over a late payment. Susp inititen verbal threats toward vict. Vict in fear for his life.

MANDATORY MARSY'S RIGHTS CARD PROVIDED TO THE VICTIM ☒    MOTIVATED BY ☐ HATRED/PREJUDICE    ☐ DOMESTIC VIOLENCE

REPORTING EMPLOYEE(S)

| INITIALS, LAST NAME | SERIAL NO. | DIV./DETAIL | PERSON REPORTING | SIGNATURE | OR RECEIVED BY PHONE |
|---|---|---|---|---|---|
| Mendoza | 42126 4 | Desk | | Teresa Wolfe | |

NOTE: IF SHORT FORM AND VICTIM/PR ARE NOT THE SAME, ENTER PR INFORMATION IN INVOLVED PERSONS SECTION.

## THIS REPORT DOES NOT CONSTITUTE VALID IDENTIFICATION

KEEP THIS REPORT FOR REFERENCE. INSTRUCCIONES EN ESPANOL AL REVERSO.

*Your case will be assigned to a detective for follow-up investigation based upon specific facts obtained during the initial investigation. Studies have shown that the presence of these facts can predict whether a detailed follow-up investigation would likely result in the arrest and prosecution of the suspect(s) or the recovery of property, in a manner that is cost-effective to you, the taxpayer. Significant decreases in personnel have made it impossible for detectives to personally discuss each and every case with all crime victims. A detective will not routinely contact you, unless the detective requires additional information.*

**TO REPORT ADDITIONAL INFORMATION:** If you have specific facts to provide which might assist in the investigation of your case, please contact the detective Monday through Friday, between 8:00 A.M. and 9:30 A.M., or between 2:30 P.M. and 4:00 P.M. at telephone number _____. If the detective is not available when you call, please leave a message and include the telephone number where you can be reached.

**COPY OF REPORT:** If you wish to purchase a copy of the complete report, phone (213) 486-8130 to obtain the purchase price. Send a check or money order payable to the Los Angeles Police Department to Records and Identification Division, Box 30158, Los Angeles, CA 90030. Include a copy of this report or the following information with your request: 1) Name and address of victims; 2) Type of report and DR number (if listed above); 3) Date and location of occurrence. NOTE: Requests not accompanied by proper payment will not be processed.

**DR NUMBER:** If not entered on this form, the DR number may be obtained by writing to Records and Identification Division and giving the information needed to obtain a copy of the report (see above paragraph). Specify that you only want the DR number. It will be forwarded without delay. There is no charge for this service.

**CREDIT CARDS/CHECKS:** Immediately notify concerned credit corporation or banks to avoid possibility of being liable for someone else using your stolen or lost credit card or check.

**HOW YOU CAN HELP THE INVESTIGATION OF YOUR CASE:**
* Keep this report for reference.
* If stolen items have serial numbers not available at time of report, attempt to locate them and phone them to the detective at the listed number.
* If you discover additional losses, complete and mail in the Supplemental Property Loss form given to you by the reporting employee.
* Promptly report recovery of property.
* Promptly report additional information such as a neighbor informing you of suspicious activity at time crime occurred.

**VICTIM-WITNESS ASSISTANCE PROGRAM:** The Los Angeles City and County Victim-Witness Assistance Program (VWAP) can help to determine if you qualify for Victim of Violent Crime compensation. If you qualify, they will assist with filling your claim application. If you are a victim or a witness to a crime and will be going to court, they will explain the court procedures to you. Their staff may also assist you with other problems created by the crime.

To find the program location nearest to you, call the Victim-Witness Assistance Program at the Los Angeles City Attorney's Office (213) 485-6976, or the Los Angeles County District Attorney's Office (800) 380-3811.

**VICTIMS OF VIOLENT CRIME COMPENSATION: Refer to paragraph at bottom of reverse side.**

DEPARTAMENTO DE POLICIA
DE LOS ANGELES

## MEMORANDUM DE REPORTE PARA VICTIMAS

*Su caso será asignado a un detective para continuar la investigacion basandose en factores especificos obtenidos durante la investigacion inicial. Estudios han demonstrado que la presencia de estos factores pueden predecir si una investigación datallada podria resultar en el arresto y prosecución del responsable o la recuperación de la propiedad, de una manera que es menos costosa para ud, el contribuyente. Disminuciones significantes de personal han hecho imposible a los detectives discutir personalmente cada caso con todas las victimas de crimenes. El detective no lo contactara rutinariamente a menos que requiera información adicional.*

**PARA REPORTAR INFORMACIÓN ADICIONAL:** Si tiene datos especificos que proveer que puedieran asistir en la investigación de su caso, favor de comunicárse con el detective de Lunes a Viernes, entre las 8:00 o 9:30 de la mañana o entre las 2:30 o 4:00 de la tarde al teléfono _____. Si el detective no se encuenta disponible cuando usted llame, favor de dejar un mensaje incluyendo un número de teléfono dónde se pueda comunicar con ud.

**COPIA DE REPORTE:** Si deséa comprar una copia del reporte completo, llame al (213) 486-8133 para obtener el precio actual. Remita un cheque o giro postal a Los Angeles Police Department Records and Identification Division, Box 30158, Los Angeles, California 90030. Incluya con su petición una copia de este reporte o la siguiente información: 1) Nombre y domicilio de la victima(s); 2) Tipo de reporte, y numero de DR, (si está listado en esta forma); 3) Fecha y lugar de los hechos. NOTA: Peticiones no adjuntas al pago apropiado no serán procesadas.

**Numero DR:** Si no aparece en esta forma, el número DR se puede obtener escribiendo a Records and Identification Division dandoles la información necesaria para obtener una copia del reporte (véa el parrafo superior). Especifique que usted quiere el número DR. Será mandado sín tardanzas. No hay cargos por este servicio.

**TARJETA DE CREDITO/CHEQUES:** Notifique ímediatamente a su compañia de crédito o banco para evitar la posibilidad de hacerse sujeto a que álguien use sus cheques o tarjeta perdida o robada.

## COMO PUEDE AYUDAR EN LA INVESTIGACION DE SU CASO

* Mantenga este memorándum como referencia.
* Si los bienes robados tienen número de serie, y no los tenía al llenar el reporte trate de localizarlos y llame al detective al número listado.
* Si descrube perdidas adicionales, llene y mande la forma Supplemental Property Loss proveida por el empleado tomando el reporte.
* Reporte la recuperación de bienes de imediato.
* Reporte detalles addicional de imediato tal como un vecino informandole de actividad sospechosa en el tiempo en que occurió el delito.

PROGRAMA DE ASISTENCIA A VICTIMAS Y TESTIGOS: El programa de asistencia a víctimas y testigos de la ciudad y del condado de Los Angeles (VWAP) puede ayudar a determinar si usted califica para una compensación como víctima de un crimen violento. Si usted califica, le ayudarán a llenar su reclamo. Si usted es víctima o testigo de un crimen y estará asistiendo a la corte, ellos le explicarán el procedimiento de la corte. El personal del programa también le puede ayudar con otros problemas causados por el crimen.

Para encontrar el sitio del programa mas cercano a usted, llame al Programa de Asistencia a Víctimas y Testigos en la oficina del abogado de la Ciudad de Los Angeles (213) 485-6976 o a la oficina del Fiscal del Condado de Los Angeles (800) 380-3811.

COMPENSACION PARA VICTIMAS DE CRIMENES VIOLENTOS: Si usted ha sido víctima de un crimen violento y está herido a causa de ese crimen, usted puede calificar para un reembolso de parte del Estado por gastos médicos: pérdidas de sueldo o de mantenimiento, rehabilitación o reentrenamiento vocacional. Si la herida o la muerte resultó a causa de un accidente automovilístico, usted o su afectado también puede calificar si el chófer culpable fué somtido a uno de los siguientes cargos: conducir bajo la influencia del alcohol o de drogas; chocar y huir; usar el vehículo como arma, o huyendo del sitio de un delito violento.

Si usted pagó los gastos fúnebres de una víctima de un delito violento, puede ser reembolsado hasta $2,275 por los gastos. El Estado no reembolsará por daños ni pérdidas de propiedad. La ley (Sección 13959 y las subsiguientes secciones del Código Gubernamental) requiere que la víctima sea residente de California, que reporte el crimen y que coopere con la ley para recibir el reembolso. Usted tiene un año, a partir de la fecha del delito, para hacer su reclamo (este límite se puede extender si hay una causa que lo justifique).

Obtenge una solicitud como víctima de crimen violento llamando al Programa de Asistencia a Víctimas y Testigos: Abogado de la Ciudad (213) 485-6976, Abogado de Distrito (800) 380-3811. Tambien puede encontrar aplicaciones en las estaciones de la policía de Los Angeles.

VICTIMS OF VIOLENT CRIME COMPENSATION: If you are a victim of a violent crime and are injured as a result of the crime, you may be able to be repaid by the State for medical expenses, loss of wages or support, rehabilitation or job retraining. If injury or death was the result of an auto accident, you or your survivor may also qualify if the driver at fault was charged with one of the following: driving under the influence of alcohol or drugs; hit and run; using the vehicle as a weapon; or fleeing the scene of a violent crime.

If you paid the funeral/burial expenses for someone who was a victim of a violent crime, you may be repaid up to $2,275 for these expenses. Property loss or damage will not be repaid by the State. The law (California Government Code Section 13959 et seq.) requires that a victim must be a California resident, must report the crime, and must cooperate with law enforcement in order to receive repayment. You have one year from the date of the crime to file a claim (may be extended for good cause).

To Obtain a victim of violent crime application, you may call one of these Victim-Witness Assistance Programs: City Attorney - (213) 485-6976, District Attorney - (800) 380-3811. Copies of the application may also be obtained at any Los Angeles police station.

## GUARDE ESTE MEMORANDUM PARA REFERENCIA

www.LAPDOnline.org
www.joinLAPD.com

## Victims' Bill of Rights - Marsy's Law

The California Constitution, Article I, Section 28, confers certain rights to victims of crime as they are defined in the law. Those rights include:

**1. Fairness and Respect**
To be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process.

**2. Protection from the Defendant**
To be reasonably protected from the defendant and persons acting on behalf of the defendant.

**3. Victim Safety Considerations in Setting Bail and Release Conditions**
To have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the defendant.

**4. The Prevention of the Disclosure of Confidential Information**
To prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which discloses confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law.

**5. Refusal to be Interviewed by the Defense**
To refuse an interview, deposition, or discovery request by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, and to set reasonable conditions on the conduct of any such interview to which the victim consents.

**6. Conference with the Prosecution and Notice of Pretrial Disposition**
To reasonably confer, and to reasonably confer with the prosecuting agency, upon request, regarding, the arrest of the defendant if known by the prosecutor, the charges filed, the determination whether to extradite the defendant, and, upon request, to be notified of and informed before any pretrial disposition of the case.

**7. Notice and Presence at Public Proceedings**
To reasonable notice of all public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings, and to be present at all such proceedings.

**8. Appearance at Court Proceedings and Expression of Views**
To be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue.

**9. Speedy Trial and Prompt Conclusion of the Case**
To a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings.

**10. Provision of Information to the Probation Department**
To provide information to a probation department official conducting a pre-sentence investigation concerning the impact of the offense on the victim and the victim's family and any sentencing recommendations before the sentencing of the defendant.

**11. Receipt of Pre-Sentence Report**
To receive, upon request, the pre-sentence report when available to the defendant, except for those portions made confidential by law.

**12. Information About Conviction, Sentence, Incarceration, Release, and Escape**
To be informed, upon request, of the conviction, sentence, place and time of incarceration, or other disposition of the defendant, the scheduled release date of the defendant, and the release of or the escape date of the defendant from custody.

**13. Restitution**
A. It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

B. Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

C. All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

**14. The Prompt Return of Property**
To the prompt return of property when no longer needed as evidence.

**15. Notice of Parole Procedures and Release on Parole**
To be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender.

**16. Safety of Victim and Victim's Family in Parole Release**
To have the safety of the victim, the victim's family, and the general public considered before any parole or other post-judgment release decision is made.

**17. Information About These 16 Rights**
To be informed of the rights enumerated in paragraphs (1) through (16).

For more information on Marsy's Law, visit the Attorney General's Website at: www.ag.ca.gov/victimservices/

To obtain information on the Victim Services Unit Center nearest to you contact:

Attorney General's Victim Services Unit
1-877-433-9069

## Derechos Civiles de Víctimas - Ley de Marsy

El artículo 1, sección 28(b) de la Constitución de California confiere ciertos derechos a las víctimas de delitos. Estos derechos incluyen:

**1. Equidad y respeto**
A ser tratado con equidad y respeto por su privacidad y nidad, y a estar libre de intimidación, acoso y maltrato durante todo el proceso penal o de justicia de menores.

**2. Protección del acusado**
A estar razonablemente protegida del acusado y de las personas que actúan en nombre del acusado.

**3. Consideración de la seguridad de la víctima al fijar la fianza y condiciones de puesta en libertad**
A que se considere la seguridad de la víctima y de la familia de la víctima al establecer el monto de la fianza y las condiciones de puesta en libertad del acusado.

**4. Prevención de divulgación de información confidencial**
A que se impida la divulgación de información o registros confidenciales al acusado, al abogado del acusado o a cualquier otra persona que actúe en nombre del acusado, que se pueda utilizar para ubicar o acosar a la víctima o a la familia de la víctima o que revelan comunicaciones confidenciales hechas en el curso de un tratamiento médico o de consejería, o que sean privilegiadas o confidenciales conforme a la ley.

**5. Rehusarse a ser entrevistada por la defensa**
A rehusarse a ser entrevistada, tener que declarar bajo juramento o someterse a un proceso de revelación solicitado por el acusado, el abogado del acusado o cualquier otra persona que actúe en nombre del acusado, y a establecer condiciones razonables para la realización de una entrevista consentida por la víctima.

**6. Conferencia con la fiscalía y aviso de las disposiciones tomadas antes del juicio**
A recibir un aviso razonable y consultas razonables por parte de la fiscalía, bajo petición, con respecto al arresto del acusado, si el fiscal llegara a tener conocimiento del mismo, los cargos de los que se le acusa, la determinación de extradición del acusado y, bajo pedido, a ser notificada e informada antes de cualquier disposición del caso dictada antes del juicio.

**7. Aviso y presencia en las actuaciones públicas**
A recibir un aviso razonable de todas las actuaciones públicas, como por ejemplo actuaciones de delincuencia, bajo pedido, en las que el acusado y el fiscal tengan derecho a estar presentes, y todas las actuaciones de libertad condicional o de liberación posteriores a la condena, y a estar presente en dichas actuaciones.

**8. Comparecencia en actuaciones de la corte y expresión de sus puntos de vista**
A que se le escuche, bajo pedido, en cualquiera de dichas actuaciones, incluso en una actuación de delincuencia donde se delibere una decisión de puesta en libertad después de un arresto, declaración de culpabilidad o inocencia, sentencia, decisión de puesta en libertad posterior a la condena o cualquier otra actuación que afecte el derecho de la víctima.

**9. Juicio rápido y conclusión oportuna del caso**
A un juicio rápido, y a una conclusión oportuna y final del caso y de todas las actuaciones posteriores al fallo.

**10. Proporcionar información al Departamento de Libertad Vigilada**
A proporcionar información a un funcionario del departamento de libertad vigilada que esté realizando una investigación previa a la sentencia, sobre el impacto de la infracción cometida sobre la víctima y la familia de la víctima, y a proporcionar recomendaciones de sentencia antes de que se dicte la sentencia del acusado.

**11. Acceso al informe previo a la sentencia**
A recibir, bajo pedido, el informe previo a la sentencia cuando esté a su disposición, excepto el acusado, salvo aquellas porciones confidenciales conforme a la ley.

**12. Información sobre la condena, sentencia, encarcelamiento, liberación y escape**
A ser informada, bajo pedido, de la condena, sentencia, lugar y fecha de encarcelamiento, u otra disposición dada al acusado, la fecha programada de puesta en libertad del acusado y la liberación o escape del acusado de su custodia.

**13. Restitución**
A. Es la intención del estado de California tiene la intención inequívoca de que todas las personas que sufran pérdidas como consecuencia de una actividad penal tengan el derecho a solicitar y recibir restitución de las personas condenadas por haber cometido los delitos que causaron las pérdidas que sufrieron.

B. En caso de que la víctima haya sufrido una pérdida, se ordenará al malhechor en todos los casos que pague restitución, independientemente de la sentencia o disposición dictada.

C. Todos los pagos monetarios, dinero y bienes recaudados a una persona a quien se ordenó el pago sean el restituir se aplicarán primero al pago de los montos de restitución a la víctima que se hayan ordenado.

**14. El retorno puntual de sus bienes**
Al retorno puntual de sus bienes cuando ya no se los necesite como prueba.

**15. Aviso de actuaciones de libertad condicional y puesta en libertad condicional**
A ser informada de todas las actuaciones de libertad condicional, a participar en el proceso de libertad condicional, a proporcionar información a la autoridad de libertad condicional con el objeto de que se la considere antes de otorgar la libertad condicional al infractor, y a ser notificada, bajo pedido, de la libertad condicional u otro tipo de libertad otorgada al infractor.

**16. Considerar la seguridad de la víctima y el público para otorgar libertad**
A que se considere la seguridad de la víctima, de la familia de la víctima y del público en general antes de tomar una decisión de otorgar la libertad condicional u otro tipo de libertad posterior al fallo.

**17. Información sobre estos 16 derechos**
A que se le informe sobre los derechos enumerados en los párrafos (1) a (16).

Para obtener más información sobre la Ley de Marsy, visite el sitio web del Procurador General en:
www.ag.ca.gov/victimservices/

Para obtener información sobre el Centro de Asistencia a Víctimas y Testigos más cercano póngase en contacto con el Attorney General's Victim Services Unit 1-877-433-9069

# EXHIBIT B

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636        Fax: 888-305-7562

## MERCHANT AGREEMENT

Dated the 20TH day of SEPTEMBER, 2017 by and between Complete Business Solutions Group, Inc. ("FAF" and/or "PURCHASER") and the "SELLER/MERCHANT" listed below (as "Seller/Merchant" or "the Merchant").
Business Legal Name: RADIANT IMAGES, INC
D/B/A: IID CAMERA RENTALS
Type of entity (check one) [X] Corporation   [] LLC   [] Limited Partnership []   Limited Liability Partnership   [] Sole Proprietor
Physical Address: 2702 MEDIA CENTER DR, LOS ANGELES, CA 90065
Mailing Address: 2702 MEDIA CENTER DR, LOS ANGELES, CA 90065

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FAF (making FAF the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payers (collectively the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business) until such time as the "Receipts Purchased Amount" has been delivered by Merchant to FAF.

The Purchased Amount shall be paid to FAF by Merchant's irrevocably authorizing only one depositing account acceptable to FAF (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's receipts, until such time as FAF receives payment in full of the Receipts Purchased Amount.   In consideration of servicing the account, the Merchant hereby authorizes FAF to ACH debit the "Specified Daily Amount" from the merchant's bank account as the base payment credited against the Specified Percentage due.   It is the Merchant's responsibility to provide bank statements for any and all bank accounts by the Merchant to reconcile the daily payments made against the Specified Percentage permitting FAF to debit or credit the difference to the merchant so that payment equals the Specified Percentage.   Failure to provide all of their bank statements in a timely manner or missing a month shall forfeit all rights to future reconciliations.   FAF may upon Merchant's request, adjust the amount of any payment due under this Agreement at FAF's sole discretion and as it deems appropriate in servicing this Agreement. Merchant understands that it is responsible for ensuring that funds adequate to cover amount to be debited by FAF remains in the account.   Merchant will be held responsible for any fees incurred by FAF resulting from a rejected ACH attempt or an event of default. (See Appendix A).   FAF is not responsible for any overdrafts or rejected transactions in the Merchants account which may result from FAF's scheduled ACH debit under the terms of this agreement.   Notwithstanding anything to the contrary in this Agreement or any other agreement between FAF and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.   A list of all fees applicable under this agreement is contained in Appendix A.

**Purchase Price: $500,000.00    Specified Percentage:  2% Specific Weekly and Monthly Amount:  **Schedule PG2 Receipts Purchased Amount:  $915,947.63**

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGES 2 THROUGH 12 HEREOF ARE HERBY INCORPORATED HEREIN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

FOR THE SELLER/MERCHANT
By: GIANNA WOLFE                    X 
                                                           (Seller/Merchant's Signature)

OWNER
By: GIANNA WOLFE                    X
                                                           (Owner's Signature)

**FAST ADVANCED FUNDING, INC.**

By _____
               Company Officer

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below.   Each of above-signed Merchant and Owner(s) represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of FAF documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and FAF and FAF shall be entitled to all remedies available under law.   Merchant and each of the above-signed Owners authorizes FAF, its agents and representatives and any credit-reporting agency engaged by FAF to, (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/Owner(s) continue to have any obligation owed to FAF.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION**

*Merchant Initials* 

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636        Fax: 888-305-7562

| Date | Week | Principal | Fees | Total Payment | Balance |
|------|------|-----------|------|---------------|---------|
| 09/27/17 | 1 | $          - | $  10,000.00 | $  10,000.00 | $  500,000.00 |
| 10/04/17 | 2 | $          - | $  10,000.00 | $  10,000.00 | $  500,000.00 |
| 10/11/17 | 3 | $          - | $  10,000.00 | $  10,000.00 | $  500,000.00 |
| 10/18/17 | 4 | $  27,777.78 | $  10,000.00 | $  37,777.78 | $  500,000.00 |
| 10/25/17 | 5 | $          - | $  9,444.44 | $  9,444.44 | $  472,222.22 |
| 11/01/17 | 6 | $          - | $  9,444.44 | $  9,444.44 | $  472,222.22 |
| 11/08/17 | 7 | $          - | $  9,444.44 | $  9,444.44 | $  472,222.22 |
| 11/15/17 | 8 | $          - | $  9,444.44 | $  9,444.44 | $  472,222.22 |
| 11/22/17 | 9 | $  27,777.78 | $  9,444.44 | $  37,222.22 | $  472,222.22 |
| 11/29/17 | 10 | $          - | $  8,888.89 | $  8,888.89 | $  444,444.44 |
| 12/06/17 | 11 | $          - | $  8,888.89 | $  8,888.89 | $  444,444.44 |
| 12/13/17 | 12 | $          - | $  8,888.89 | $  8,888.89 | $  444,444.44 |
| 12/20/17 | 13 | $  27,777.78 | $  8,888.89 | $  36,666.67 | $  444,444.44 |
| 12/27/17 | 14 | $          - | $  8,333.33 | $  8,333.33 | $  416,666.67 |
| 01/03/18 | 15 | $          - | $  8,333.33 | $  8,333.33 | $  416,666.67 |
| 01/10/18 | 16 | $          - | $  8,333.33 | $  8,333.33 | $  416,666.67 |
| 01/17/18 | 17 | $          - | $  8,333.33 | $  8,333.33 | $  416,666.67 |
| 01/24/18 | 18 | $  27,777.78 | $  8,333.33 | $  36,111.11 | $  416,666.67 |
| 01/31/18 | 19 | $          - | $  7,777.78 | $  7,777.78 | $  388,888.89 |
| 02/07/18 | 20 | $          - | $  7,777.78 | $  7,777.78 | $  388,888.89 |
| 02/14/18 | 21 | $          - | $  7,777.78 | $  7,777.78 | $  388,888.89 |
| 02/21/18 | 22 | $  27,777.78 | $  7,777.78 | $  35,555.56 | $  388,888.89 |
| 02/28/18 | 23 | $          - | $  7,222.22 | $  7,222.22 | $  361,111.11 |
| 03/07/18 | 24 | $          - | $  7,222.22 | $  7,222.22 | $  361,111.11 |
| 03/14/18 | 25 | $          - | $  7,222.22 | $  7,222.22 | $  361,111.11 |
| 03/21/18 | 26 | $          - | $  7,222.22 | $  7,222.22 | $  361,111.11 |
| 03/28/18 | 27 | $  27,777.78 | $  7,222.22 | $  35,000.00 | $  361,111.11 |
| 04/04/18 | 28 | $          - | $  6,666.67 | $  6,666.67 | $  333,333.33 |
| 04/11/18 | 29 | $          - | $  6,666.67 | $  6,666.67 | $  333,333.33 |
| 04/18/18 | 30 | $          - | $  6,666.67 | $  6,666.67 | $  333,333.33 |
| 04/25/18 | 31 | $  27,777.78 | $  6,666.67 | $  34,444.44 | $  333,333.33 |
| 05/02/18 | 32 | $          - | $  6,111.11 | $  6,111.11 | $  305,555.56 |
| 05/09/18 | 33 | $          - | $  6,111.11 | $  6,111.11 | $  305,555.56 |
| 05/16/18 | 34 | $          - | $  6,111.11 | $  6,111.11 | $  305,555.56 |
| 05/23/18 | 35 | $  27,777.78 | $  6,111.11 | $  33,888.89 | $  305,555.56 |
| 05/30/18 | 36 | $          - | $  5,555.56 | $  5,555.56 | $  277,777.78 |
| 06/06/18 | 37 | $          - | $  5,555.56 | $  5,555.56 | $  277,777.78 |
| 06/13/18 | 38 | $          - | $  5,555.56 | $  5,555.56 | $  277,777.78 |
| 06/20/18 | 39 | $  27,777.78 | $  5,555.56 | $  33,333.33 | $  277,777.78 |
| 06/27/18 | 40 | $          - | $  5,000.00 | $  5,000.00 | $  250,000.00 |
| 07/04/18 | 41 | $          - | $  5,000.00 | $  5,000.00 | $  250,000.00 |
| 07/11/18 | 42 | $          - | $  5,000.00 | $  5,000.00 | $  250,000.00 |
| 07/18/18 | 43 | $          - | $  5,000.00 | $  5,000.00 | $  250,000.00 |
| 07/25/18 | 44 | $  27,777.78 | $  5,000.00 | $  32,777.78 | $  250,000.00 |
| 08/01/18 | 45 | $          - | $  4,444.44 | $  4,444.44 | $  222,222.22 |
| 08/08/18 | 46 | $          - | $  4,444.44 | $  4,444.44 | $  222,222.22 |
| 08/15/18 | 47 | $          - | $  4,444.44 | $  4,444.44 | $  222,222.22 |
| 08/22/18 | 48 | $  27,777.78 | $  4,444.44 | $  32,222.22 | $  222,222.22 |
| 08/29/18 | 49 | $          - | $  3,888.89 | $  3,888.89 | $  194,444.44 |
| 09/05/18 | 50 | $          - | $  3,888.89 | $  3,888.89 | $  194,444.44 |
| 09/12/18 | 51 | $          - | $  3,888.89 | $  3,888.89 | $  194,444.44 |
| 09/19/18 | 52 | $  27,777.78 | $  2,459.13 | $  30,236.91 | $  194,444.44 |
| 09/26/18 | 53 | $          - | $  3,333.33 | $  3,333.33 | $  166,666.67 |
| 10/03/18 | 54 | $          - | $  3,333.33 | $  3,333.33 | $  166,666.67 |
| 10/10/18 | 55 | $          - | $  3,333.33 | $  3,333.33 | $  166,666.67 |
| 10/17/18 | 56 | $  27,777.78 | $  3,333.33 | $  31,111.11 | $  166,666.67 |
| 10/24/18 | 57 | $          - | $  2,777.78 | $  2,777.78 | $  138,888.89 |
| 10/31/18 | 58 | $          - | $  2,777.78 | $  2,777.78 | $  138,888.89 |
| 11/07/18 | 59 | $          - | $  2,777.78 | $  2,777.78 | $  138,888.89 |
| 11/14/18 | 60 | $          - | $  2,777.78 | $  2,777.78 | $  138,888.89 |
| 11/21/18 | 61 | $  27,777.78 | $  2,459.13 | $  30,236.91 | $  138,888.89 |
| 11/28/18 | 62 | $          - | $  2,222.22 | $  2,222.22 | $  111,111.11 |
| 12/05/18 | 63 | $          - | $  2,222.22 | $  2,222.22 | $  111,111.11 |
| 12/12/18 | 64 | $          - | $  2,222.22 | $  2,222.22 | $  111,111.11 |
| 12/19/18 | 65 | $          - | $  2,222.22 | $  2,222.22 | $  111,111.11 |
| 12/26/18 | 66 | $  27,777.78 | $  2,222.22 | $  30,000.00 | $  111,111.11 |
| 01/02/19 | 67 | $          - | $  1,666.67 | $  1,666.67 | $  83,333.33 |
| 01/09/19 | 68 | $          - | $  1,666.67 | $  1,666.67 | $  83,333.33 |
| 01/16/19 | 69 | $          - | $  1,666.67 | $  1,666.67 | $  83,333.33 |
| 01/23/19 | 70 | $  27,777.78 | $  2,459.13 | $  30,236.91 | $  83,333.33 |
| 01/30/19 | 71 | $          - | $  1,111.11 | $  1,111.11 | $  55,555.56 |

Page | 2

*Merchant Initials*

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

| 02/06/19 | 72 | $ - | $ 1,111.11 | $ 1,111.11 | $ 55,555.56 |
| 02/13/19 | 73 | $ - | $ 1,111.11 | $ 1,111.11 | $ 55,555.56 |
| 02/20/19 | 74 | $ 27,777.78 | $ 1,111.11 | $ 28,888.89 | $ 55,555.56 |
| 02/27/19 | 75 | $ - | $ 555.56 | $ 555.56 | $ 27,777.78 |
| 03/06/19 | 76 | $ - | $ 555.56 | $ 555.56 | $ 27,777.78 |
| 03/13/19 | 77 | $ - | $ 555.56 | $ 555.56 | $ 27,777.78 |
| 03/20/19 | 78 | $ 27,777.78 | $ 2,459.13 | $ 30,236.91 | $ 27,777.78 |
| | | $ 500,000.00 | $ 415,947.63 | $ 915,947.63 | |

## MERCHANT AGREEMENT TERMS AND CONDITIONS

**I. TERMS OF ENROLLMENT IN PROGRAM**
**1.1 Electronic Fund Transfer.** Upon request from FAF ("FUNDER") Merchant shall execute such forms or agreements acceptable to FUNDER, with Bank acceptable to FUNDER, to obtain electronic fund transfer services. Merchant shall provide FUNDER, and/or its authorized agent with all the information, authorization and passwords necessary for verifying Merchant's receivable, receipts and deposits into the account Merchant shall authorize FUNDER and/or it's agent to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to FUNDER by permitting FUNDER to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable without the written consent of FUNDER.
**1.2 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to FUNDER, with a Bank acceptable to FUNDER, to obtain electronic fund transfer services. Merchant shall provide FUNDER and/or its authorized agent with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts and deposits into the account. Merchant shall authorize FUNDER and/or it's agent to deduct the amounts owed to FUNDER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to FUNDER by permitting FUNDER to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable without the written consent of FUNDER.
**1.3 Term of Agreement.** This Agreement shall have a term of one year. Upon the expiration of the term, this Agreement shall automatically renew for successive one-year terms, provided, however, that during the renewal term(s) Merchant may terminate this Agreement upon ninety days' prior written notice (effective upon receipt) to FUNDER. The termination of this Agreement shall not affect Merchant's responsibility to satisfy all outstanding obligations to FUNDER at the time of termination.
**1.4 Future Purchases.** FUNDER reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.
**1.5 Financial Condition. Merchant and Guarantor(s)** authorize FUNDER and its agents to investigate their financial responsibility and history, and will provide to FUNDER any bank or financial statements, tax returns, etc., as FUNDER deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. FUNDER is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes their bank to provide FUNDER with Merchant's banking or processing history to determine qualification or continuation in this program.
**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by FUNDER.
**1.8 No Liability.** In no event will FUNDER be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).
**1.9 Reliance on Terms.** Sections 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, FUNDER and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.
**1.10 Sale of Receipts.** Merchant and FUNDER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FUNDER to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts. FUNDER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to FUNDER in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.
**1.11 Power of Attorney** Merchant irrevocably appoints FUNDER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to

FUNDER from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.
**1.12 Protections Against Default.** The following Protections 1 through 7 may be invoked by FUNDER, immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the FUNDER electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to FUNDER; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER; or (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to FUNDER at law, in equity or otherwise pursuant to this Agreement.
Protection 1. The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately
Protection 2. FUNDER may enforce the provisions of the Personal Guarantee of Performance against the Guarantor.

*Merchant Initials* GW

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF


**FAF**
Fast Advance Funding

141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

Protection 3. Merchant shall, upon execution of this Agreement, deliver to FUNDER an executed confession of judgment in favor of FUNDER in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, FUNDER may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon.

Protection 4. FUNDER may enforce its security interest in the Collateral identified in Article III hereof.

Protection 5. The entire Purchase Amount shall become immediately refundable to FUNDER from Merchant.

Protection 6. FUNDER may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which FUNDER shall recover judgment against Merchant, Merchant shall be liable for all of FUNDER's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

Protection 7. Merchant shall, upon execution of this Agreement, deliver to FUNDER an **executed assignment of lease of Merchant's premises** in favor of FUNDER. Upon breach of any provision in this paragraph 1.12, FUNDER may exercise its rights under such assignment of lease.

Protection 8. FUNDER may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise.

Protection 9. In the event Merchant changes or permits the change of the Processor approved by FAF, or adds an additional Processor, in violation of Section 1.11 above, FAF shall have the right, without waiving any of its rights and remedies and without notice to Merchant, to notify the new or additional Processor of the sale of the Receipts hereunder and to direct such new or additional Processor to make payment directly to FAF of all or any portion of the amount received by such Processor.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes FUNDER to disclose information concerning Merchant's and each Owner's credit standing (including credit bureau reports that FUNDER obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner hereby waives to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates relating to any (i) investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement and any other FUNDER documentations (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of FUNDER to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

**1.15 Publicity.** Merchant and each Owner only authorizes FUNDER to use its, his or her name in a

listing of clients and in advertising and marketing materials with their express written consent.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS** Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Its bank and financial statements, copies of which have been furnished to FUNDER, and future statements which will be furnished hereafter at the discretion of FUNDER, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material adverse change in its financial condition, operation or ownership. FUNDER may request statements at any time during the performance of this Agreement and the Merchant shall provide them to FUNDER within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming FAF as loss payee and additional insured in amounts and against risks as are satisfactory to FUNDER and shall provide FUNDER proof of such insurance upon request.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without FUNDER's prior written consent. Any such change shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and FUNDER or change any of its places of business.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, person firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary

petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are immediately invoked.

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than FUNDER.

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FUNDER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default under Other Contracts.** Merchant's execution and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**III. EVENTS OF DEFAULT AND REMEDIES**

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of FUNDER; (j) Merchant shall change its depositing account without the prior written consent of FUNDER; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with FUNDER.

**3.2 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, FUNDER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. FUNDER may also file a Complaint in Confession of Judgment pursuant to the Warrant of

*Merchant Initials* ___

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF


**FAF**
Fast Advance Funding

141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636        Fax: 888-305-7562

Attorney contained herein. All rights, powers and remedies of FUNDER in connection with this Agreement may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 WARRANT OF ATTORNEY TO CONFESS JUDGMENT.** UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, MERCHANT AND GUARANTOR IRREVOCABLY AUTHORIZE AND EMPOWER ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT AND GUARANTOR FOR SUCH SUMS AS ARE DUE AND/OR MAY BECOME DUE UNDER THIS MERCHANT AGREEMENT OR ANY ACCOMPANYING DOCUMENTS, WITH OR WITHOUT DECLARATION, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT, FOR LIEN PRIORITY PURPOSES, EQUAL TO TEN PERCENT (10%) OF THE AMOUNT OF SUCH JUDGMENT, BUT NOT LESS THAN ONE THOUSAND DOLLARS ($1,000.00), ADDED FOR ATTORNEYS' COLLECTION FEES, WITH THE ACTUAL AMOUNT OF ATTORNEY'S FEES AND COSTS TO BE DETERMINED IN ACCORDANCE WITH THE SECTION OF THIS MERCHANT AGREEMENT "ATTORNEY'S FEES AND COLLECTION COSTS." TO THE EXTENT PERMITTED BY LAW, MERCHANT AND GUARANTOR: (1) WAIVE THE RIGHT OF INQUISITION ON ANY REAL ESTATE LEVIED ON, VOLUNTARILY CONDEMNS THE SAME, AUTHORIZES THE PROTHONOTARY OR CLERK TO ENTER UPON THE WRIT OF EXECUTION THIS VOLUNTARY CONDEMNATION AND AGREES THAT ANY REAL ESTATE MAY BE SOLD ON A WRIT OF EXECUTION; (2) WAIVE AND RELEASE ALL RELIEF FROM ALL APPRAISEMENT, STAY, EXEMPTION OR APPEAL LAWS OF ANY STATE NOW IN FORCE OR HEREINAFTER ENACTED; AND (3) RELEASE ALL ERRORS IN SUCH PROCEEDINGS. IF A COPY OF THIS MERCHANT AGREEMENT, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF FUNDER SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL MERCHANT AGREEMENT AS A WARRANT OF ATTORNEY. THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT AND GUARANTOR SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE THEREOF AND MAY BE EXERCISED AS OFTEN AS FUNDER SHALL FIND IT NECESSARY AND DESIRABLE AND THIS BUSINESS CASH ADVANCE AND SECURITY AGREEMENT SHALL BE A SUFFICIENT WARRANT THEREFOR. FUNDER MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNTS OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNTS. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST THE MERCHANT OR GUARANTOR HEREUNDER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON MERCHANT'S OR GUARANTOR'S BEHALF FOR ANY REASON, FUNDER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST MERCHANT OR GUARANTOR FOR ANY PART OR ALL OF THE AMOUNTS OWED HEREUNDER, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY ERRORS AND DEFECTS IN SUCH PRIOR PROCEEDINGS.

**3.4 Costs.** Merchant shall pay to FUNDER all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of FUNDER's remedies set forth in Section 4.2 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications. Merchant is required to give FUNDER written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.**

**IV. MISCELLANEOUS**

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by FUNDER.

**4.2 Assignment.** FUNDER may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt.

**4.4 Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, FUNDER and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of FUNDER which consent may be withheld in FUNDER's sole discretion. FUNDER reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if FUNDER so elects, be instituted in any court sitting in Pennsylvania, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by FUNDER to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement hereby embody the entire agreement between Merchant and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**4.11 Counterparts & Facsimile/Email Signatures.** This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original, all of which together shall be deemed one and the same instrument. Further, facsimile and email signatures shall be deemed to be originals for all purposes.

*Merchant Initials* GW

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

**SECURITY AGREEMENT AND GUARANTY**

Seller/Merchant's Legal Name: RADIANT IMAGES, INC DBA HD CAMERA RENTALS

Guarantor's Legal Name: GIANNA WOLFE

████████████████████

Physical Address: 2702 MEDIA CENTER DR, LOS ANGELES, CA 90065

████████████████████

**SECURITY AGREEMENT**

**Security Interest**. To secure Merchant's payment and performance obligations to FUNDER under the Merchant Agreement (the "Factoring Agreement"), Merchant hereby grants to FUNDER a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined in Article 9 of the UCC (a and b collectively, the "Collateral").

**Cross-Collateral**. To secure Guarantor's payment and performance obligations to FUNDER under this Security Agreement and Guaranty (the "Agreement"), Guarantor hereby grants FUNDER a security interest in __ (the "Additional Collateral"). Guarantor understands that FUNDER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to FUNDER under any other agreement between Merchant or Guarantor and FUNDER (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral, the Additional Collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest, which financing statement may contain notification that Merchant and Guarantor have granted a negative pledge to FUNDER with respect to the Collateral, the Additional Collateral and the Cross-Collateral, and that any subsequent lien or may be tortuously interfering with FUNDER's rights. Merchant and Guarantor shall be liable for and FUNDER may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge**. Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral , the Additional Collateral or the Cross-Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. FUNDER shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified Merchant capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

**SELLER/MERCHANT**
**BY: GIANNA WOLFE**

DocuSigned by:

*Gianna Wolfe*

(Signature)
568FD6340957488...

*Merchant Initials* GW

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636                    Fax: 888-305-7562

## GUARANTY

**Personal Guaranty of Performance**. The undersigned Guarantor(s) hereby guarantees to FUNDER, Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts.

**Guarantor Waivers**. In the event that Merchant fails to make a payment or perform any obligation when due under the Merchant Agreement, FUNDER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral FUNDER may hold pursuant to this Agreement or any other guaranty.

FUNDER does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement ; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**GUARANTOR ACKNOWLEDGEMENT**. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**JOINT AND SEVERAL LIABILITY**. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**SELLER/MERCHANT**
By: GIANNA WOLFE

DocuSigned by:
*Gianna Wolfe*
(Signature)
568FD6340957488...

Driver's License Number: 386765524

**OWNER/GUARANTOR**
BY: GIANNA WOLFE

DocuSigned by:
*Gianna Wolfe*
568FD6340957488...

Driver's License Number: ▮▮▮▮

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY.

CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant Initials
DS
GW

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF


**Fast Advance Funding**

141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

### DISCLOSURE FOR CONFESSION OF JUDGMENT

AFFIANT:          GIANNA WOLFE

OBLIGEE:          Fast Advance Funding, Inc.

The undersigned has executed, and/or is executing, on even date herewith, one or more of the following instruments under which the undersigned is obligated to repay monies to Obligee:

1.          Merchant Agreement dated  SEPTEMBER 20, 2017, 2017; and

A.          THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENTS CONTAIN PROVISIONS UNDER WHICH OBLIGEE MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED.  BEING FULLY AWARE OF THE UNDERSIGNED'S RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT MAY BE ASSERTED AGAINST THE UNDERSIGNED BY OBLIGEE THEREUNDER BEFORE JUDGMENT IS ENTERED, THE UNDERSIGNED HEREBY FREELY, KNOWINGLY, AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO OBLIGEE'S ENTERING JUDGMENT AGAINST THE UNDERSIGNED BY CONFESSION PURSUANT TO THE TERMS THEREOF.

B.          THE UNDERSIGNED ALSO ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENTS CONTAIN PROVISIONS UNDER WHICH OBLIGEE MAY, AFTER ENTRY OF JUDGMENT AND WITHOUT EITHER NOTICE OR A HEARING, FORECLOSE UPON, ATTACH, LEVY, OR OTHERWISE SEIZE PROPERTY OR PROCEED AGAINST THE INTERESTS OF THE UNDERSIGNED IN PROPERTY (REAL OR PERSONAL) IN FULL OR PARTIAL PAYMENT OR SATISFACTION OF THE JUDGMENT OR JUDGMENTS.  BEING FULLY AWARE OF THE UNDERSIGNED'S RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE TO OPEN OR STRIKE THE JUDGMENT OR JUDGMENTS), THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO OBLIGEE'S TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE UNDERSIGNED.

C.          The undersigned hereby certifies that the financial accommodations being provided by the Obligee are for a business purpose, and not for personal, family or household use.

D.          The statements made in this Disclosure for Confession of Judgment are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

**SELLER/MERCHANT**
By: GIANNA WOLFE

*Gianna Wolfe*
(Signature) — 568FD6340957488...

Driver's License Number: █████████

**OWNER/GUARANTOR**
BY: GIANNA WOLFE

*Gianna Wolfe*
(Signature) — █████40957488...

Driver's License Number: █████

Merchant Initials _GW_

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2ⁿᵈ Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

### AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. You should keep this important legal document for your records.

DISBURSEMENT OF BUSINESS CASH ADVANCE PROCEEDS: By signing below, Merchant authorizes Funder to disburse the Cash Advance Proceeds less the amount of any applicable fees upon approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to Funder) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying documents. This authorization is to remain in full force and effect until Funder has received written notification from Merchant of its termination in such time and in such manner as to afford Funder and Merchant's depository bank a reasonable opportunity to act on it.

AUTOMATIC PAYMENT PLAN: Enrollment in Funder's Automatic Payment Plan is required for approval. By signing below, Merchant agrees to enroll in the Automatic Payment Plan and authorizes Funder to collect payments required under the terms of Merchant Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Merchant Agreement Supplement. Merchant authorizes Funder to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Funder has received written notification from Merchant of its termination in such time and in such manner as to afford Funder and Merchant's depository bank a reasonable opportunity to act on it. Funder may suspend or terminate Merchant's enrollment in the Automatic Payment Plan immediately if Merchant fails to keep Merchant's designated checking account in good standing or if there are insufficient funds in Merchant's checking account to process any payment.

If Merchant revokes the authorization or Funder suspends or terminates Merchant's enrollment in the Automatic Payment Plan, Merchant still will be responsible for making timely payments pursuant to the alternative payment methods described in the Merchant Agreement.

BUSINESS PURPOSE ACCOUNT: By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

ACCOUNT CHANGES: Merchant agrees to notify Funder promptly if there are any changes to the account and routing numbers of the Designated Checking Account

MISCELLANEOUS: Funder is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

Signature: _Gianna Wolf_                    Date: 9/19/2017          

Bank Name: City National Bank

City: Beverly Hills          State: CA          Zip: 90210

Routing Number: ██████

Account Number: ██████

Business Name on Account: Radiant Images

Address on Account: 2702 Media Center Drive

Merchant Phone #: 323-737-1314          Tax ID Number: ██████

Email: gianna@radiantimages.com

Signature: _Gianna Wolf_
—DocuSigned by:
—568FD6340957488...

Title: CFO

Merchant Initials _GW_

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania  19106
Phone: 215-922-2636                   Fax: 888-305-7562

### BANK ACCOUNT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from Fast Advance Funding, Inc., the undersigned Merchant hereby makes the following statement under penalty of law:

**PLEASE SIGN OPTION 1 OR TWO**

**OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:**

The Merchant hereby declares that in addition to the designated for ACH debit, the Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account:

Bank Name
Name on Account
Account Number
Routing Number
Fed ID number associated with this account
Name associated with this account
Phone number of person whose name is associated with this account

Bank Name
Name on Account
Account Number
Routing Number
Fed ID number associated with this account
Name associated with this account
Phone number of person whose name is associated with this account

Bank Name
Name on Account
Account Number
Routing Number
Fed ID number associated with this account
Name associated with this account
Phone number of person whose name is associated with this account

Bank Name
Name on Account
Account Number
Routing Number
Fed ID number associated with this account
Name associated with this account
Phone number of person whose name is associated with this account
**attach additional pages if necessary**

Merchant Signature   _Gianna Wolf_   Dated   9/19/2017
                     568FD6340957488...

Merchant Signature   _____   Dated   _____

**OPTION 2** - By signing below, the merchant swears, under penalty of law, that he has no accounts in any lending institution in addition to the one provided for ACH debit

Merchant Signature   _____   Dated   _____

Merchant Signature   _____   Dated   _____

Merchant Initials   _GW_

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

**CUSTOMER AUTHORIZATION TO RESUME ACH DEBITING FORM**

NAME OF MERCHANT : _____

CUSTOMER INFORMATION (To be filled out by the customer)

I authorize Company (as sown above) to resume electronically debiting <u>my</u> bank account as detailed below, including a non-sufficient fund fee if applicable, until the debt to the company is paid in full.

Full Name on Account: _____

Account #: _____     Routing #: _____

Account Type (select one):     Checking     ☐          Savings     ☐

Account Class (select one):     Consumer Account     ☐          Business Account     ☐

Payment amount: _____          Number of Payments: _____

Date of next payment: _____     Frequency of payments: _____

I understand that I may cancel this authorization by contacting the company at least five (5) business days prior to the payment due date. I further understand that canceling my ACH authorizations does not relieve me of the responsibility of paying my account in full, and that if I cancel or revoke this authorization before the debt is paid in full, the Company may take additional actions including legal actions to secure the debt.

Customer signature: _____          Date: _____

Customer Printed Name: _____

Customer contact Telephone #: _____

*Merchant Initials* _____

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2ⁿᵈ Street Philadelphia, Pennsylvania  19106
Phone: 215-922-2636          Fax: 888-305-7562

Dear Merchant,

Thank you for accepting this offer from Fast Advance Funding, Inc.  We look forward to being your funding partner for as long as you need.

Daily ACH Program:

Fast Advance Funding will require viewing access to your bank account prior to funding as part of our underwriting process, as well as during the time you have a balance with our company.

Please be assured that we carefully safeguard your confidential information and only essential top level personnel will have access to it.

Please fill out the form below with the information necessary to access your account.

**Be sure to indicate capital or lower case letters.

NAME OF BANK; ___CITY NATIONAL BANK_____

BANK PORTAL WEBSITE: _____www.CNB.com_____

USERNAME: _____█████_____

PASSWORD: _____████████_____

SECURITY QUESTION/ANSWER 1: ____███████████_____

SECURITY QUESTION/ANSWER 2: _____ᵐ██████████_____

SECURITY QUESTION/ANSWER 3: ____██████████_____

ANY OTHER INFORMATION NECESSARY TOO ACCESS YOU ACCOUNTS:

_____

_____

*Merchant Initials*  ⌐DS
                     𝒢𝒲

DocuSign Envelope ID: 084AC920-D2F8-4597-A580-65F8075A1BCF



141 N. 2nd Street Philadelphia, Pennsylvania 19106
Phone: 215-922-2636          Fax: 888-305-7562

## APPENDIX A:  THE FEE STRUCTURE

1.   Origination Fee:  $WAIVED to cover underwriting and related expenses

2.   ACH Program Fee - $WAIVED – The ACH program is labor intensive and is not an automated process, requiring us to charge this fee to cover related costs;

3.   NSF Fee - $75.00 (each) - Up to FOUR TIMES ONLY before a default is declared;

4.   Rejected ACH - $100.00 – If a merchant directs the bank to reject our debit ACH;

5.   Bank Change Fee - $50.00 – If a merchant requires a change of account to be debited requiring us to adjust our system;

6.   Blocked Account - $250.00 – If a merchant blocks FAF's ACH debit of the Account, bounces more than 4 debits of the Account or simultaneously uses multiple bank accounts or credit-card processors to process its receipts;

7.   Default Fee - $500.00 default fee – If a merchant changes bank accounts or switches to another credit card processor without FAF's consent, or commits another default pursuant to the Agreement;

8.   3rd Party Intermediary Fee – $4,000.00 deposit toward reasonable related expenses incurred by PURCHASER.  If PURCHASER receives a communication from a 3rd party debt relief/renegotiator entity or individual which has been retained by Merchant and which contacts PURCHASER on Merchant's behalf seeking to redirect communication (related to the obligations contained in this Agreement) to itself/themselves and away from Merchant.  This fee shall be used to cover Purchaser's reasonable expenses in retaining counsel or other parties to handle this additional administration required by this retention of the intermediary by PURCHASER.  Any portion of the fee that is not used by PURCHASER for this purpose shall be returned to Merchant at the conclusion of this Factoring Agreement or related legal action.

9.   Collections Expense – In the event of default, Seller / Merchant shall be responsible for all reasonable costs of collections, including, but not limited to, counsel fees, filing fees and any other fees which may be incurred.

10.  Miscellaneous Service Fees – Merchant shall pay certain fees for services related to the origination and maintenance of accounts.  Each Merchant shall receive their funding electronically to their designated bank account and will be charged $WAIVED for a Fed Wire.  The current charge for the underwriting, UCC, ACH Program and origination of each Merchant will be paid from the funded amount.  Merchant will be charged $100.00 for every additional change of their operating bank account once they are active with FAF.  Additional copies of prior monthly statements will incur a fee of $10.00 each.

11.  Risk Assessment Fee - $WAIVED

12.  UCC Fee – $WAIVED

Merchant Signature: _____  Name: _____ Gianna wolfe _____  ⬅

Guarantor Signature: _____  Name: _____ Gianna wolfe _____  ⬅

*4825-9004-4450, v.  1*

*Merchant Initial*

# EXHIBIT C



**CalculatorSoup®**
Online Calculator Resource

Calculators > Financial > Loans > Advanced Loan Calculator          Basic Calculator

# Advanced Loan Calculator

### Advanced Loan Calculator

**Choose a Calculation**
Find the Interest Rate ▾

Loan Amount: $ 500,000.00

Compounding: Weekly (52/Yr) ▾

**Payments**

Amount $ 11,742.92

Total # 78

Frequency Weekly (52/Yr) ▾

Clear                Calculate

Answer:
   Annual Interest Rate = 90.187%

Create an Amortization Schedule

*Share this Calculation: help*

https://www.calculatorsoup.com/calculators/financial
/loan-calculator-advanced.php?
given_data=find_ratepercent&pv=500000&m=52&p
mt=11742.92&nper=78&q=52&given_data_last=find
_ratepercent&action=solve

*Get a Widget for this Calculator*

©CalculatorSoup

*Share this Calculator & Page*

     

## Calculator Use

Calculate loan payments, loan amount, interest rate or number of payments. Use this calculator to try different loan scenarios for affordability by varying loan amount, interest rate, and payment frequency. Create and print a loan amortization schedule to see how your loan payment pays down principal and bank interest over the life of the loan.

A key feature of this calculator is that it allows you to calculate loans with different compounding and payment frequencies. You can also use our underline basic loan calculator which assumes your loan has the typical monthly payment frequency and monthly interest compounding.

**Loan Amount**
   The original principal on a new loan or principal remaining on an existing loan.
**Interest Rate**
   The annual nominal interest rate, or stated rate of the loan.
**Compounding**
   The frequency or number of times per year that interest is compounded. If compounding and payment frequencies are different, this calculator converts interest to an equivalent rate and calculations are performed in terms of payment frequency.
**Number of Payments**
   The number of payments required to repay the loan.
**Payment Frequency**
   How often payments are made each year. Number of Payments ÷

> Payment Frequency = Loan Term in Years.
> *Payment Amount*
>     The amount to be paid on the loan at each payment due date.

## Calculator Options

### Find the Payment Amount

Calculate the payment required for your loan amount and term. Find your ideal payment amount by changing loan amount, interest rate, and number of payments in the loan. Try different loan scenarios and create and print an amortization schedule or create a loan payment table to easily compare principal and interest amounts.

### Find the Loan Amount

Try different loan amounts to see how it affects the required monthly payment. Alternatively, see our How Much Loan Can I Afford? calculator. If you have an existing loan, input your interest rate, monthly payment amount and how many payments are left to calculate the principal that remains on your loan.

### Find the Interest Rate

Input loan amount, number of months required to pay off the loan and payment amount to calculate the interest rate on the loan.

### Find the Number of Payments

Input different payment amounts for a loan to see how long it will take you to pay off the loan. If you have an existing loan input remaining principal, interest rate and monthly payment to calculate the number of payments remaining on your loan.

## Amortization Calculations

When payment and compounding frequencies differ, we first calculate the Equivalent Interest Rate so that interest compounding is the same as payment frequency. We use this equivalent rate to create the loan payment amortization schedule.

**Cite this content, page or calculator as:**

Furey, Edward "Advanced Loan Calculator"; from *https://www.calculatorsoup.com* - Online Calculator Resource.

© 2006 - 2018 CalculatorSoup®
All rights reserved.

# EXHIBIT D



This e-mail is the property of Radiant Images, Inc. It is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, or otherwise protected from disclosure. Distribution or copying of this e-mail, or the information contained herein, to anyone other than the intended recipient is prohibited.

---------- Forwarded message ----------
From: **Lucia Marianni** <lucia@parfunding.com>
Date: Fri, Feb 16, 2018 at 6:31 AM
Subject: Notice of Assignment DUST WORX :: RADIANT IMAGES
To: art@sevada.com
Cc: gianna@radiantimages.com, info@radiantimages.com, Joe Mack <Joe@parfunding.com>

To Whom It May Concern,

We have purchased the future receivables for Radiant Images Inc. DBA HD Camera Rentals. Please see the attached correspondence which details said transaction. Despite our contractual agreement, Radiant Images Inc. DBA HD Camera Rentals has since defaulted on their payment. Accordingly, per UCC 9-406, please allow this correspondence to serve as a request that you hold all funds payable to Radiant Images Inc. DBA HD Camera Rentals in reserve until $2,651,880.22 is accrued.

While this decision does not come easy to us, as our goal is to build long term relationships with our clients, it is imperative that we practice fair business and honor the terms of our contracts.

Should you have any questions and/or concerns do not hesitate to contact me.

**Lucia Marianni**

**Legal and Collections Coordinator**



20 N. 3rd Street
Philadelphia, PA 19106

Office: (267) 223-4219

Fax: (888) 305-7562

CONFIDENTIALITY NOTICE: This email and any attachments are intended solely for the use of the named recipient(s). Please do not forward or copy without the author's consent. Any dissemination of this email by anyone other than an intended recipient is strictly prohibited. If you have received this email in error, please permanently delete the email and all attachments from your system. All information contained in this document are considered proprietary and shall not be reproduced, transmitted or shared with any individual or company outside the specific group for which this information is strictly intended.

# EXHIBIT E



141 N 2ND ST
PHILADELPHIA PA 19106

Norman M. Valz & Associates, P.C.
*205 Arch Street - 2nd Floor*
*Philadelphia, PA 19106*
*Tel. 267-223-4219*                                    *(NOT FOR SERVICE OF PAPERS)*


February 16, 2018


**<u>Via Electronic Mail</u>**
DustWorx Pictures Ltd


### <u>UCC LIEN NOTICE OF ASSIGNMENT</u>


Re:
***<u>RADIANT IMAGES INC. DBA HD CAMERA
RENTALS</u>***


To Whom It May Concern,

I am one of the attorneys for Complete Business Solutions Group LLC,(CBSG). This letter serves as formal notice pursuant to Section 9-406 of the Uniform Commercial Code ("UCC") as it has come to our attention that DustWorx Pictures Ltd and/or their parent or subsidiary entity(ies) (collectively, "DustWorx Pictures Ltd") is an Account Debtor (as this term is defined by the UCC) of the merchant named RADIANT IMAGES INC. DBA HD CAMERA RENTALS (the "Merchant"), located at 2702 Media Center Dr, Los Angeles CA 90065.

Please be advised that the Merchant has defaulted on a secured merchant agreement entered into by and between the Merchant and CBSG in September, 2017 (the "Agreement"). The balance currently due and owing to CBSG pursuant to the Agreement is $2,651,880.22.

The Agreement was structured so that CBSG was to receive a percentage of all of the Merchant's accounts-receivable. In accordance with the Agreement, CBSG filed a UCC-1 financing statement with the Secretary of State of California, thereby obtaining a perfected security interest in the Merchant's assets, including without limitation the Merchant's accounts-receivable. A copy of the UCC-1 is also enclosed herein for your reference.

It has come to CBSG's attention that DustWorx Pictures Ltd has made payments to Merchant, representing the Merchant's accounts-receivable. While it is understood that DustWorx Pictures Ltd has an agreement with the Merchant and not CBSG, this letter is nonetheless being sent

to instruct DustWorx Pictures Ltd, in accordance with UCC 9-406 to hold in reserve, all funds payable to the Merchant as of the date of this notice, until the amount of $2,651,880.22accrues, whereupon same should be forwarded to my client. I am confident that once the above-requested action is taken by DustWorx Pictures Ltd, in addition to mitigating the risk to DustWorx Pictures Ltd with respect to converting the funds in which CBSG has a secured interest, this matter will be quickly resolved.

Please comply with the above immediately, and contact me at 267-223-4219 or at legaldepartment@parfunding.com if you have any questions or follow-up. I thank you in advance for your anticipated cooperation in this matter.

Very truly yours,
Complete Business Solutions Group, Inc.

_____

Norman M. Valz – Legal Counsel for
Complete Business Solutions Group, Inc.

# drummc

Wednesday, February 21, 2018
12:18:12
EDPA disclosure.pdf